UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 1:07CR 198 CAS |
| | ) | |
| GARY McMULLIN, | ) | |
| | ) | |
| Defendant(s). | ) | |

## REPORT AND RECOMMENDATION

Defendant Gary McMullin has filed his Motion to Suppress (Document #26) accompanied by a Memorandum in Support (Document #27). The government filed Government's Response to Defendant's Motion to Suppress Evidence (Document #37-2). After an evidentiary hearing on defendant's Motion to Suppress and the filing of a transcript of that hearing, defendant filed Defendant's Memorandum Following Motion to Suppress Hearing (Document #49). The government filed Government's Memorandum in Opposition to Defendant's Motion to Suppress Evidence (Document #51). Defendant then filed Defendant's Reply to Government's Memorandum in Opposition to Defendant's Motion to Suppress (Document #52).

### Factual Background

On June 11, 2006, the State of Illinois issued three felony arrest warrants charging Daryl Crowder with Predatory Criminal Sexual Assault of a Child, Unlawful Failure to Register as a Sex Offender and Indecent Solicitation of a Child.

The United States Marshal's Office is responsible for locating unregistered sex offenders who cross state lines. Illinois law enforcement officers contacted the Marshal's Office to ask for their help

in locating Crowder. United States Marshals Sean Newlin and Dave Davis were detailed to try to locate Crowder. (Tr., p. 4, 5, 6)

Newlin made contact with Crowder's wife and obtained information that Crowder was placing telephone calls from a residence located at HCR 6, Box 121, Doniphan, Missouri. Newlin checked the address and discovered that another registered sex offender, a convicted felon, Gary McMullin, was residing at that same address. (Tr., p. 6, 7)

On October 10, 2007, Newlin and Davis drove to McMullin's residence to try to locate Crowder. The marshals arrived early in the morning. Davis was driving, Newlin was the passenger. The vehicle they were in was unmarked, but the deputies were wearing jackets marked "U. S. Marshal" on the front and back. As the marshals drove up the driveway to the residence, Newlin saw a person looking out a front window of the house. (Tr., p. 7, 8, 24, 45)

Davis stopped the vehicle and got out. He walked around to the back of the McMullin house. Newlin got out of the vehicle and walked toward the house. Around that time, Newlin heard a person yell from inside the house. "The U. S. Marshals are here." Newlin walked up the steps of the house to the front door. McMullin then opened the front door from the inside. Newlin recognized McMullin from a photo that he had seen of McMullin from the sex offender registry site. (Tr., p. 8, 9)

Gary McMullin's testimony at the suppression hearing differed considerably from that of Deputy Newlin. McMullin testified that when Newlin first stood at the front door of the house, that Davis began shouting at the back of the house on the outside. McMullin testified that he did not invite Newlin in, that when Davis began shouting, Newlin ran into the house, trying to get to the outside from the back of the house. McMullin also stated that Newlin drew his gun at that time. (Tr., p. 46-48, 58, 60)

Newlin's testimony was significantly different. Newlin testified that when McMullin opened the front door at the marshals' arrival, Newlin and McMullin greeted each other. Newlin asked if there is anybody else home. (Tr., p. 11) McMullin then said, "You know, I'm just having coffee with my uncle." Newlin asked, "May I come in and talk with you?" McMullin replied, "Yeah, sure, come on in. We're just having coffee." McMullin stepped back inside the residence and started walking back into the house. Newlin followed him down a hallway to a kitchen table. As they were walking down the hall, Newlin asked again if there was anyone else in the house. McMullin replied, "No. I'm just having coffee with my uncle." Newlin asked what the uncle's name was. McMullin replied, "Carroll." (Tr., p. 11, 12)

When they arrived at the kitchen, Newlin saw an older male sitting at the table. McMullin said, "This is my uncle. We're just sitting here having coffee." Newlin again asked if there was anyone else in the house. McMullin replied, "No. It's just my uncle and I." Newlin looked at the table and saw three cups of coffee. He asked why there was a third cup of coffee. McMullin stated that it was just him and his uncle. This conversation took between two and three minutes. (Tr., p. 13, 14, 25)

At this time, Newlin heard Davis yell from outside the house, "Get down. Get down on the ground." Newlin attempted to find a back door to get to Davis, but he could not find his way through the house. McMullin showed Newlin the way to the back door. Newlin went outside at the rear of the home and observed Davis and Daryl Crowder. Crowder was prone on the ground with his fingers interlaced and on top of his head. Newlin asked Crowder who he was. Crowder told Newlin his correct name. (Tr., p. 14, 15)

McMullin then came out the back door of the house. Newlin asked McMullin who the man was that was on the ground. McMullin first said he didn't know, then said his name was Thomas

Junior. Newlin then told McMullin to turn around; that he was going to be detained. McMullin complied and was handcuffed. Newlin again asked who the man was. McMullin said he did not know, that "he told me his name was Thomas Junior." Newlin talked to McMullin about obstruction of justice. After that, Newlin said, "Well, let's go back into the house and talk." Newlin then took McMullin back into the house. Newlin had to help the handcuffed McMullin up the steps to re-enter the residence. (Tr., p. 15, 16, 27)

Newlin and McMullin walked back into the kitchen of the residence. At that time, Evelyn Moore was also sitting at the table. Newlin asked McMullin again who was in the back yard. Newlin testified, "The defendant again hesitates answering any of my questions regarding that." Newlin asked McMullin if he was comfortable talking in front of his aunt and uncle. McMullin answers, "Yeah, that's fine, I'll talk. You know I don't have a problem talking in front of them." Newlin told McMullin that he knew who the man was in the back yard. McMullin dropped his shoulders and said, "Yeah, that's Daryl Crowder." (Tr., p. 17, 18)

When the two men had walked back into the kitchen, Newlin saw some ammunition in an ashtray sitting on a desk. Newlin told McMullin that he had seen the bullets and asked McMullin if there were any guns in the house. McMullin stated, "Yes, there are." McMullin motioned with his head toward a wall by the kitchen. Newlin looked in that direction and saw some long guns lined up against the wall. There were seven long guns at that location. Evelyn Moore told Newlin about the location of a handgun in a desk drawer. Those firearms were all seized. (Tr., p. 17-20) Newlin testified that when he was in the kitchen, the long guns, the rifles, were all in plain view.

Newlin stated that he did not draw his service weapon at any time during this encounter. He also stated that he never gave a <u>Miranda</u> warning to McMullin and that he did not have a search warrant to search the house. (Tr., p. 27, 33, 67)

- 4 -

**Discussion**

The first task of the court is to determine who is the more reliable reporter of the facts, Deputy Marshal Newlin or Defendant Gary McMullin.

In Deputy Newlin's favor that he is telling the truth is his admission that he did not read the Miranda warnings to Mr. McMullin before questioning him. He also admitted that on his first time into the home of Gary McMullin he did not notice the long guns stacked against the wall in plain sight in the kitchen/living room. If on his first trip through, Newlin had seen the rifles, many of the questions involved in this case would have been eliminated and Newlin could have arrested McMullin as a felon in possession of firearms and taken him to jail. On the other side of the ledger, there is motivation for an officer to protect the validity of an arrest. The court is not suggesting that Deputy Marshal Newlin lied or gave an incorrect account of what happened, but possible motivation is a consideration in the court's attempting to assess the reliability of individuals' testimony when opposing versions are presented.

The reliability of Mr. McMullin's testimony is more questionable. According to the testimony of Newlin (uncontradicted in this respect), Newlin asked McMullin if anyone else was in the house, which the defendant denied three times, (Tr. 12), (Tr. 13), (Tr. 13), before they went outside the mobile home where Deputy Marshal Davis had encountered Daryl Crowder. A fourth time the defendant refused to tell Deputy Newlin that the person on the ground with his hands on his head was Daryl Crowder. When asked who the person was, defendant said he did not know, (Tr. 15) saying instead, "He told me his name was Thomas Junior" when McMullin knew that was not Crowder's name. (Tr. 49) The defendant admitted that he had not spoken accurately when he said that only his aunt and uncle were the other persons in the house. He admitted at the evidentiary hearing that he knew that statement was not accurate. (Tr. 54) He also admitted at the hearing that Daryl Crowder

was not Mr. Thomas. (Id.) Most striking is Mr. McMullin's attitude toward lying. When asked, "But you gave a false name in response to Mr. Newlin, Officer Newlin's request to who it was, didn't you?" Mr. McMullin replied, "Of course." (Tr. 55) as if it should be expected that he would lie. He was later asked, "But you remember explicitly lying to the agent about whether Daryl Crowder or anyone else was in the house at that time, you remember that, don't you?" "Of course." "And you remember explicitly lying to the agent as to who the identity of Mr. Crowder was?" "Yes."

The defendant did acknowledge with regard to a seeming inconsistency in his memory about who led the way down the hall of his residence, "Everything is months old. And the events, sir, are not easy on anybody. So I don't recall everything a hundred percent. But I'm thinking that Officer Newlin either went around me where there was sufficient room or went to the left and went straight through." McMullin was then asked, "So you don't recall?" He responded, "I don't recall." (Tr. 57) Later Mr. McMullin was asked, "And your memory isn't very good about what, in fact, happened that day, is it?" "Some of it is, some of it is not." (Tr. 58)

Motivation was a factor considered when deciding about Deputy Newlin's accuracy in recalling the facts. The defendant would have the strongest motivation, with his liberty at stake, to recall a version of facts more favorable to a finding that he did not invite Marshal Newlin in and, consequently, his rights had been violated by the marshal's entry.

The court finds the testimony of Deputy Newlin about the events that occurred at the residence occupied by the defendant located at HCR 6, Box 121, Doniphan, Missouri, on October 10, 2007, to be accurate. The court accepts Newlin's version of the facts as true and the version offered by the defendant at the evidentiary hearing as inaccurate.

The court finds that, in accordance with the testimony of Deputy Marshal Newlin, Gary McMullin did tell Newlin when the deputy asked McMullin, "May I come in and talk to you?",

"Yeah, sure, come on in, we're just having coffee." The court finds that Newlin entered the residence at the invitation of Gary McMullin.

### **Investigatory Detention**

An investigatory detention, defined as a brief seizure by police officers, is lawful if based on reasonable suspicion. Terry v. Ohio, 392 U.S. 1, 20-21, 88 S.Ct. 1868, 1879 (1968). A legal investigatory detention requires, on the part of police, a reasonable, articulable suspicion that a person is engaged in criminal activity. Id. The specific and articulable facts required for reasonable suspicion taken together with rational inferences from those facts, justify the intrusion and the court must evaluate the reasonableness of the investigatory detention in light of the particular circumstances surrounding it. Terry, 392 U.S. at 21, 88 S.Ct. at 1880. United States v. Walker, 494 F.3d 688, 691 (8th Cir. 2007)(petition for cert. filed (Nov. 2007)). A judge in making that assessment is to use an objective standard: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." 392 U.S. at 21-22, 88 S.Ct. at 1880. Subjective intentions of police are irrelevant to an evaluation of the constitutionality of a detention under the Fourth Amendment. Whren v. United States, 517 U.S. 806, 811-13, 116 S.Ct. 1769, 1773 (1996).

Did the deputy marshals have reasonable, articulable suspicion that the defendant, Gary McMullin, was engaged in criminal activity or, as stated elsewhere, that "criminal activity 'may be afoot?'" United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 752 (2002).

The deputy marshals had come from Illinois to Missouri to try to apprehend a fugitive, Daryl Crowder, for whom they had three felony arrest warrants charging Crowder with Predatory Criminal Sexual Assault of a Child, Unlawful Failure to Register as a Sex Offender and Indecent Solicitation of a Child. (Tr. 5, 6) A reasonable law officer would consider a person charged as Crowder was to

be dangerous. The deputy marshals knew McMullin was a convicted sex offender and was a registered sex offender in the State of Missouri. It was after Gary McMullin had denied three times that Daryl Crowder was in the residence when, in fact, Crowder had been in the residence, and after it was determined by Newlin that the person whom Deputy Davis had stopped and had made to lie on the ground <u>was</u> Crowder, that Gary McMullin was placed in handcuffs. Newlin talked to McMullin about obstruction of justice. Newlin made it clear to McMullin that McMullin was being detained. (Tr. 16) McMullin had not yet been arrested. (Tr. 22) He was placed in handcuffs for officer safety (Tr. 29) and at that time, only for officer safety. (<u>Id</u>.) McMullin, himself a convicted sex offender, had been lying to protect Crowder for whom there were three active felony warrants for sexual offenses. Newlin's concern about the other two relatives in the trailer (Tr. 29) and what they might be up to (Tr. 30) was one of the reasons he went back into the trailer. (Tr. 29, 30) He also wanted to interview McMullin, but, at the same time, he was concerned about the two relatives inside, so he brought McMullin into the trailer so he could also keep an eye on the relatives. (<u>Id</u>.) A reasonable law enforcement officer could view the circumstances as a dangerous situation, and Deputy Newlin was justified in handcuffing Gary McMullin for officer safety and to preserve the status quo. Newlin still considered McMullin detained. (Tr. 33, 39)

## **Investigatory Detention or Arrest?**

The Supreme Court has declined to establish a bright-line rule to determine when an investigatory detention becomes an arrest. "... common sense and ordinary human experience must govern over rigid criteria." <u>United States v. Sharpe</u>, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575 (1985). Lower courts decide on a case-by-case basis whether an investigatory detention has become an arrest. In making such decisions, the Eight Circuit held, in <u>United States v. Ruiz</u>, 412 F.3d 871,

879-80 (8th Cir. 2005), that investigatory detention is distinguishable from arrest based on the length of detention, presence of unnecessary delays, and the use of restraints.

The length of detention of Gary McMullin was very short. He was handcuffed, brought inside and when Newlin saw the bullets in the ashtray (Tr. 17, 39), he was asked if there were any guns in the house (Tr. 18). McMullin said there were guns in the house and indicated by his head movement where the long guns were. When Newlin saw the long guns in plain view, the defendant was ararested. There were no unnecessary delays.

As Newlin testified at the hearing, the invitation to enter the house was never rescinded. (Tr. 37) Newlin had good reason to go back in to interview McMullin and at the same time check on and keep an eye on the relatives. McMullin had already shown himself ready to help and protect a dangerous fugitive. The deputy marshals did not know what the relatives were capable of. The location where all of these incidents occurred was not an urban area where law enforcement help was readily available, but on Rural Route 6 in Ripley County, Missouri, (Tr. 7) in what Newlin described as a "very rural area" which the marshals were not able to locate themselves and had to seek the assistance of the Doniphan Police Department to find. (Tr. 8) The marshals were justified in preserving the status quo by the use of handcuffs.

In spite of the defendant's claim that Deputy Marshal Newlin went back into the house to search, Newlin did not go back into the house to search. He went back in to check on the relatives and to talk further with McMullin. It was only when he saw the bullets, the ammunition, that he thought there might be weapons present that he asked about the guns.

Once Newlin observed the bullets, he became concerned about the possibility that weapons could be present. He asked McMullin if there were any guns in the house, and McMullin responded. Evelyn Moore, defendant's aunt, volunteered, "If you're looking for the guns, there's another one

in the desk drawer over here." Newlin found a .32 caliber revolver in the desk drawer. Realizing that McMullin had been convicted of a felony, Newlin seized all the firearms.

It is the defendant's position that Marshal Newlin illegally returned to the house when he brought the defendant back in. The court has found that the defendant invited Deputy Marshal Newlin into the home on the marshal's arrival. That invitation was never rescinded. (Tr. 37) It is true that Newlin went into the back yard; however, he did not leave the premises. He was still in the curtilage of the home. As noted, he was interested in maintaining the status quo which included monitoring what the defendant's uncle and aunt were doing. (Tr. 29, 30) Newlin did not re-enter the mobile home to search for weapons. He was interviewing the defendant and concerned about Uncle Carroll Sutton and Mrs. Moore. The defendant, dressed only in gym shorts and sandals in the early morning of October 10, 2007, by his own testimony, was getting cold. (Tr. 50) In United States v. Gray, 369 F.3d 1024, 1026 (8th Cir. 2004), the Court of Appeals for the Eighth Circuit stated, "Withdrawal of consent need not be effectuated through particular 'magic words,' but an intent to withdraw consent must be made by unequivocal act or statement. United States v. Ross, 263 F.3d 844, 846 (8th Cir. 2001)." Finally, Mr. McMullin, as the government points out, testified before the grand jury with reference to the long guns seized, "I allowed them [marshals and ATF] to search my bedroom and every other area of the house they wanted to. The only weapons was what was plainly visible." There is no evidence that McMullin ever objected to Marshal Newlin's presence in the home.

**Absence of Miranda Warnings**

Miranda warnings are required only when a suspect is in custody and is being interrogated. Illinois v. Perkins, 496 U.S. 292, 297 (1990). There is no question that McMullin was being interrogated or questioned about the possible presence of Daryl Crowder in the home. With reference

to custody, "The ultimate inquiry is whether (1) the person has been formally arrested, or (2) the person's freedom of movement has been restrained to a degree associated with a formal arrest." United States v. LeBrun, 363 F.3d 715, 720. In Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138 (1984), the Supreme Court considered the circumstances of a Terry stop, an investigatory detention. The Court held:

> Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." United States v. Brignoni-Ponce, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" Ibid. (quoting Terry v. Ohio, supra, 392 U.S., at 29, 88 S.Ct., at 1884.) Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda.

468 U.S. at 439-40, 104 S.Ct. at 3150.

Marshal Newlin suspected Daryl Crowder was in the home. He suspected McMullin was not telling the truth and was, in effect, lying to protect Daryl Crowder, to prevent Daryl Crowder from being arrested. Newlin was asking Gary McMullin "a moderate number of questions to determine [Crowder's] identity and to try to obtain information confirming or dispelling the officer's suspicions." Id. With respect to McMullin, Newlin's suspicion was that McMullin was lying about the presence of Crowder and thus was possibly obstructing justice. Newlin's questions were directed toward that suspicion. The defendant was not arrested for obstruction of justice nor was the detention an equivalent of arrest.

Newlin was attempting to serve an arrest warrant. The detention of McMullin was similar to the detention which may occur when a search warrant is being executed, when the purpose of the

- 11 -

detention is to preserve the status quo. Persons detained during the execution of a legally-obtained search warrant are not in custody if no other factors indicate the presence of a coercive atmosphere. Michigan v. Summers, 452 U.S. 692, 702 (1981).

The Court of Appeals for the Eight Circuit, in United States v. Martinez, 462 F.3d 903 (8th Cir. 2006), stated its position on the use of handcuffs as a means of preserving the status quo during an investigatory stop:

> During a Terry stop, officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the stop. Id. This court has previously held that use of handcuffs can be a reasonable precaution during a Terry stop to protect their safety and maintain the status quo. See e.g. United States v. Summe, No. 05-4179, 2006 WL 1458293 (8th Cir. May 30, 2006) (unpublished) (holding that use of cuffs to detain suspected accomplice did not constitute arrest); United States v. Saffeels, 982 F.2d 1199, 1206 (8th Cir. 1992) (overruled on other grounds)(holding that using cuffs on robbery suspect did not convert Terry stop into arrest); United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992) (concluding that cuffing of suspects during Terry stop where suspects outnumbered officers and where officers were concerned for safety was reasonably necessary to achieve purposes of Terry stop).

The court finds that while the defendant was being questioned about the presence or nonpresence of Daryl Crowder, Gary McMullin was not in the custody required to trigger the necessity of Miranda warnings.

Upon his return to the inside of the home, Newlin noticed bullets in an ashtray. He then became concerned about the presence of weapons. As previously stated, at that point, Newlin asked McMullin if there were any guns in the house, leading to discovery of the firearms.

Did the question asked by Newlin about the presence of weapons and the answer given by the defendant violate the defendant's rights under Miranda? The United States Supreme Court, in New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626 (1984), created an exception, which has come to be known as the "public safety exception." In that case, a young woman approached two officers in Queens, New York, and told the officers that she had just been raped by a man, she described him,

his height, what he was wearing and told the officers that the man had just entered a supermarket located nearby and that the man was carrying a gun. One officer then radioed for backup and the other officer went into the supermarket. He spotted the subject, who matched the description given by the woman, approaching a checkout counter. When he saw the officer, the subject turned and ran toward the rear of the store, and the officer pursued him with a drawn gun. The subject turned the corner at the end of an aisle and the police officer lost sight of him for several seconds. When he caught sight of him again, the officer ordered the subject to stop and put his hands over his head. The officer frisked the subject and discovered that the man was wearing a shoulder holster which was empty. After handcuffing him, the officer asked where the gun was. The subject nodded in the direction of some empty cartons and stated, "The gun is over there." The officer then retrieved a loaded .38 caliber revolver from one of the cartons and formally placed the man under arrest and read him his Miranda rights from a printed card.

In the subsequent prosecution of the case, the trial judge excluded the statement, "The gun is over there" because the officer had not given the defendant the warnings required by Miranda before asking him where the gun was located. The Appellate Division of the Supreme Court of New York affirmed. The decision by the Supreme Court (a lower court in New York) was affirmed by the Court of Appeals. The United States Supreme Court found that the case presented a situation "where concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in Miranda." 467 U.S. at 653, 104 S.Ct. at 2630. The United States Supreme Court reversed the Court of Appeals and held that there is a "public safety" exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence and that the availability of the exception does not depend upon the motivation of the individual officers involved." Id. at 655-656. The Court found that whatever the motivation of individual officers were

in such a situation, the Court did not believe that the doctrinal underpinnings of Miranda required that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety. Id. at 656, 104 S.Ct. at 2631-2632. In United States v. Williams, 181 F.3d 945 (8th Cir. 1999), the Eighth Circuit found that asking the defendant without giving Miranda warnings "Is there anything we need to be aware of?" and the defendant answering that a gun was in the closet, did not violate the requirements of Miranda. The Eighth Circuit found that the question without Miranda warnings was permissible as long as the question was reasonably prompted by a concern for public safety. 181 F.3d at 953-954.

Gary McMullin's admission that there were guns present and his head movement toward the seven long guns in response to Newlin's question, come within the exception. These statements should not be suppressed. The Eighth Circuit, in its opinion in United States v. Antwine, 873 F.2d 1144 (8th Cir. 1989), recognizes that the Supreme Court's holding in Quarles was consistent with the long recognized exigent circumstances exception to the search warrant requirement. See Quarles, 467 U.S. at 653 n. 3. The Antwine court referred to its own "long-held view that legitimate concern for the safety of individuals may constitute 'exigent circumstances' justifying warrantless entries and searches. 873 F.2d at 1146-47.

**Comments**

1. In his briefs, defendant implies that Marshal Newlin went back into the house to conduct a search. As has been stated, Newlin did not go back into the home to search. He went back in the house to further interview Defendant Gary McMullin and to maintain the status quo with regard to defendant's uncle and aunt. It was while maintaining the status quo that Newlin saw the bullets which led to his question about the presence of guns, the answer to which led to the observation in plain view of the long guns.

2. The defendant cites a number of cases in support of his argument that Marshal Newlin needed a search warrant to go back into the house after he had been outside. Those cases do not support the defendant's theory. In <u>Michigan v. Clifford</u>, 464 U.S. 287 (1984), the Supreme Court held that firefighters may enter premises where there is a fire without obtaining a warrant. The Court held further that firefighters may remain in the fire-damaged building to investigate the cause of the blaze after it has been extinguished, <u>citing</u> <u>Michigan v. Tyler</u>, 436 U.S. 499 (1978). The need for a warrant applied after the firefighters left the premises and other individuals entered the premises to investigate the possibility of arson. A rule requiring a warrant for the firefighters to return is not absolute and there are exceptions. 464 U.S. at 293 n. 4. In the instant case, the marshals did not ever leave the premises. Newlin was continuing to follow up on his suspicions of criminal activity on McMullin's part, which he held even before Crowder was found. In <u>Thompson v. Louisiana</u>, cited by the defendant, 469 U.S. 17 (1984), deputies who first came in response to being told of a murder took a victim's body to the hospital, leaving the premises. Later, other investigators entered and began to search for evidence. The Court held that they needed a search warrant. Again, this is not applicable to Marshals Newlin and Davis. Defendant cites <u>Arizona v. Hicks</u>, 480 U.S. 321 (1987). Officers were investigating a shooting and came across extensive stereo equipment. The Court found that probable cause that the equipment was stolen was required for the seizure of the stereo equipment under the plain view doctrine. In the instant case when Newlin saw the rifles, that sight joined with his knowledge of McMullin's felony convictions, provided the probable cause to seize the weapons.

3. In his Reply (Document #52, p. 3), defendant states, "Daryl Crowder, having been placed prone on the ground and refusing to place his hands behind his back, was repeatedly struck by Marshal Davis until such time as he placed his hands behind his back. (Tr. 15-16) Once a person has

been seized by the United States Marshals, they will submit or be beaten." No evidence of such beating was presented at the evidentiary hearing. Defendant cites to pages 15 and 16 of the transcript. These pages contain no such beating incident.

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress (Document #26) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(l), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

                              LEWIS M. BLANTON
                              UNITED STATES MAGISTRATE JUDGE

Dated this 13th day of May, 2008.